**Juana GONZALEZ, Plaintiff–Appellant,**

v.

**INGERSOLL MILLING MACHINE COMPANY, Defendant–Appellee.**

No. 97–1335.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 14, 1997.

Decided Jan. 14, 1998.

Willie J. Nunnery (argued), Madison, WI, for Plaintiff–Appellant.

James D. Zaglis (argued), Reno, Zahm, Folgate, Lindberg & Powell, Rockford, IL, for Defendant–Appellee.

Before WOOD, Jr., KANNE and DIANE P. WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Juana Gonzalez ("Gonzalez") sued Ingersoll in a two count complaint alleging in Count I that Ingersoll had discriminated against her because of her race and/or ethnic origin in violation of Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e–2, and in Count II, that Ingersoll had discriminated against her with respect to the making and enforcement of an alleged employment contract in violation of 42 U.S.C. § 1981. Gonzalez subsequently amended her complaint adding an additional claim of retaliation under 42 U.S.C. § 2000e–3. Finding Gonzalez had failed to provide sufficient factual support for her claims, the district court dismissed Counts I and II. After Gonzalez failed to file a timely response to Ingersoll's summary judgment motion as to Count III, the district court dismissed Count III of the amended complaint and dismissed the suit in its entirety. The district court denied Gonzalez's motions to reconsider her previous motion to accept for filing her late response and to vacate the grant of summary judgment. This appeal followed. We affirm the entry of summary judgment in favor of Ingersoll on all counts and find that the district court did not abuse its discretion by failing to consider Gonzalez's untimely response to Ingersoll's motion for summary judgment as to Count III.

## I. BACKGROUND

### A. Pertinent Facts

Gonzalez, who is both black and of Cuban descent, started working for an Ingersoll subsidiary as an insert grinder in 1979. She transferred to Ingersoll's employ in 1980 and was employed as a panel assembler. On October 31, 1986, Gonzalez was given notice that declining orders would require a layoff. After being laid off in February 1987, Gonzalez was recalled to work as a bonder in Ingersoll's machine shop in February 1989.

On March 20, 1989, Gonzalez was transferred to Ingersoll's Production Machinery Division, Assembly Department as a Basic Electrical Assembler with a skill classification of F–12. Gonzalez remained an F–12 Basic Electrical Assembler until December 1, 1993, when she was notified that she would be laid off again because of declining work orders. According to Ingersoll's layoff policy employees were to be laid off by length of service, within a job classification, within a department. After receiving 90 days of pay and benefits continuation, Gonzalez was laid off in February 1994. During this layoff, Ingersoll laid off 137 employees. Of these 137 employees, seven were from the Production Machinery Assembly Department, known as the Electrical Department, in which Gonzalez worked. Both Gonzalez and David Thompson ("Thompson"), a white male, were laid off, as were two employees

with F–13 rating classifications and three employees with F–14 skill classifications.[1]

In July 1994, Gonzalez filed a charge of discrimination with the Illinois Department of Human Rights, and the Equal Employment Opportunity Commission ("EEOC"), alleging racial and national origin discrimination regarding her February 1994 layoff. In September 1994, after unsuccessfully attempting to contact Gonzalez by phone, Ingersoll notified Gonzalez by correspondence of a recall of laid-off employees and asked her if she was interested in being recalled. Thompson had been recalled about three weeks earlier. Ingersoll manager, Brian Howard, stated that Thompson was recalled earlier than Gonzalez because attempts to contact Gonzalez by telephone had been unsuccessful.

On October 17, 1994, Gonzalez was recalled as an F–12 Panel Wire Assembler in Ingersoll's Pike Road box subassembly plant because the F–12 classification for electrical assemblers had been eliminated and Gonzalez was not qualified for an F13 classification. Although the panel wirer position had different job requirements than the electrical assembler position, the F–12 classification remained the same as were the pay and benefits. In November 1995, Gerald McCalmon ("McCalmon"), Ingersoll's Manager of Production Machinery, decided to move the box subassembly plant from Ingersoll's Pike Road facility to its Eddy Avenue facility for business reasons. At the time of his decision, McCalmon was unaware that Gonzalez had previously filed charges of discrimination against Ingersoll.

Gonzalez was transferred to Ingersoll's Eddy Avenue facility because she was the only employee performing box assembly work in November, 1995. On November 6, 1995, Marion Smith ("Smith") became Gonzalez's supervisor. Smith immediately began having problems with Gonzalez's absenteeism, attitude and quality of work. During the next two weeks Gonzalez left work several times before the end of her shift for personal reasons without notifying or obtaining permission from her supervisor. Smith warned Gonzalez that she must immediately begin working her scheduled hours and that further absenteeism could result in her being released to personnel.[2] However, Gonzalez did not handle Smith's counseling well. When Smith raised these issues, Gonzalez became verbally abusive towards Smith, using foul language and accusing a fellow employee of lying. After Gonzalez's tirade, Smith gave Gonzalez another warning about her absenteeism and attitude.

Gonzalez also had difficulty performing her work. Although her box subassembler job was one of the most basic subassembly positions, Gonzalez had about a fifty percent rework ratio on her boxes. Almost half of Gonzalez's boxes were unacceptable and had to be reworked. Gonzalez's error rate was higher than any other Ingersoll employee. Despite repeated warnings about her performance, Gonzalez's performance did not improve.

In January 1996, Ingersoll's Chief Executive Officer, Fred Wilson ("Wilson"), met with Gonzalez to discuss her performance, attendance and attitude problems. Wilson told Gonzalez that she had sixty days to show improvement. In particular, Wilson told Gonzalez that her performance and absenteeism problems must not continue in the future and that her quality and productivity must also improve. After Gonzalez's performance had not improved within 60 days, Smith released Gonzalez to Ingersoll's Personnel Department. Personnel then reassigned Gonzalez to the Custodial Department; however, her pay was not reduced. Neither Smith nor McCalmon ever mentioned anything to Gonzalez about her lawsuit.

## B. Procedural History

Much of the procedural history in this suit provides a primer on how lawyers should not manage their litigation practices. On De-

---

1. A higher classification number indicates an employee's more advanced performance level.

2. Rather than having supervisors directly terminate an employee, Ingersoll's policy was for the supervisor to release the employee to the personnel department, who would then make the ultimate decision as to the employee's status.

cember 30, 1994, after receiving a right-to-sue letter from the EEOC, Gonzalez filed a two count complaint against Ingersoll claiming discrimination on account of race and/or ethnic origin in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2, as amended, and discrimination with respect to the making and enforcement of a contract in violation of 42 U.S.C. § 1981. Following the close of discovery on October 2, 1995, Ingersoll filed a motion for summary judgment along with a Local Rule 12(m) statement of uncontested facts. The district court ordered Gonzalez to respond on or before February 28, 1996. After making an oral motion for the extension of time to respond, Gonzalez was granted an extension to respond until March 8, 1996. When Gonzalez had not responded by March 13, 1996, Ingersoll filed a Notice of Readiness for Decision and advised the district court that since Gonzalez had failed to respond to its summary judgment motion it would not be filing a reply brief.

Eleven days after her response was due, March 19, 1996, Gonzalez filed a motion requesting additional time to respond. Gonzalez presented the district court with four reasons to grant her extension: (1) Ingersoll's counsel consented to an extension until March 20, 1996, (2) it was in the interest of justice, (3) no party would be prejudiced by the delay, and (4) because of another case her counsel was unable to timely complete his response.

While the district court was considering Ingersoll's motion for summary judgment as to Counts I and II, Gonzalez sought permission to add another count to her complaint based on retaliation in violation of 42 U.S.C. § 2000e–3. Allowing the additional claim, the district court reopened discovery until September 30, 1996, with regard to the retaliation claim only. On July 22, 1996, the district court granted summary judgment in favor of Ingersoll as to Counts I and II of Gonzalez's amended complaint.

On October 30, 1996, following the close of discovery for Count III, Ingersoll filed another motion for summary judgment along with its Local Rule 12(m) statement of uncontested facts.[3] The magistrate judge set a briefing schedule requiring Gonzalez to respond to Ingersoll's summary judgment motion on or before December 2, 1996. Once again, Gonzalez failed to file her response brief on time. Two weeks later, on December 16, 1996, Gonzalez filed another motion to extend time to file her response brief. Based on Gonzalez's assertion that Ingersoll had no objection, the magistrate granted her an extension until January 6, 1997.

In a now familiar pattern, the January 6, 1997, deadline rolled past with Gonzalez filing neither a response brief nor a pre-deadline request for an extension of time. Advising the parties that it had begun work on the summary judgment motion, the district court took Ingersoll's summary judgment motion under consideration on January 9, 1997. The following day Ingersoll filed a Notice of Readiness for Decision, again noting that since Gonzalez had failed to respond Ingersoll would not be filing a reply brief. On January 13, 1997, Gonzalez filed another motion for an extension of time stating two reasons to allow the extension: (1) the interests of justice, and (2) the consent of Ingersoll's counsel. Stating that it had already begun its work and nearly finished its disposition, the district court denied Gonzalez's motion to accept the late response. In his order denying Gonzalez's motion, the district court judge stated:

> Plaintiff's attorney has displayed a pattern of inattention in that he has on numerous occasions failed to appear for pretrial conferences. Additionally, when defendant earlier filed a motion for summary judgment as to Counts I and II of the amended complaint, and the court set a due date for plaintiff's response pursuant to plaintiff's oral motion for extension of the original due date, plaintiff failed to file a timely

**3.** Local Rule 12(m) of the General Rules of the United States District Court for the Northern District of Illinois requires a party moving for summary judgment to file a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." *See also Dade v. Sherwin–Williams Co.,* 128 F.3d 1135 (7th Cir.1997) (discussing the obligations, and ramifications of failing to provide a statement, of both the movant and non-movant with respect to summary judgment).

response and, instead, filed an untimely motion for leave to extend the time to file her response.

On January 14, 1997, the district court issued an order granting summary judgment for Ingersoll as to Count III and dismissed Gonzalez's suit in its entirety. Although it denied Gonzalez's motion to accept her response and Local Rule 12(n) statement [4] late, the court noted in its order that in disposing of Ingersoll's motion for summary judgment, it had "in the interests of justice, examined the entire record to determine if a question of material fact precluded summary judgment, notwithstanding plaintiff's failure to file a timely response or Rule 12(n) statement." On January 23, 1997, the district court denied Gonzalez's motion to reconsider its earlier denial of her motion to accept for filing her late response and motion to vacate the grant of summary judgment. This appeal followed.

## II. ANALYSIS

Gonzalez appeals from the district court's grant of summary judgment in favor of Ingersoll on all three counts of her complaint. In addition, Gonzalez alleges that the district court abused its discretion when it failed to consider her untimely response [5] in deciding Ingersoll's motion for summary judgment as to Count III.

### A. Denial of the Untimely Response

As a preliminary matter, before addressing Gonzalez's substantive claims, we dismiss her assertion that the district court abused its discretion when it denied her motion to accept her late response to defendant's motion for summary judgment as to Count III. After reviewing the record, we cannot find that the district court's refusal to entertain the untimely motion was an abuse of discretion.

"District court judges, because of the very nature of the duties and responsibilities accompanying their position, possess great authority to manage their caseload." *United States v. Reed,* 2 F.3d 1441 (7th Cir. 1993), *cert. denied,* 510 U.S. 1079, 114 S.Ct. 898, 127 L.Ed.2d 90 (1994). Consequently, this court reviews decisions such as the district court's refusal here to grant Gonzalez an extension of time only for abuse of discretion. *See Smith v. Severn,* 129 F.3d 419 (7th Cir.1997) (district court did not abuse its discretion in vacating magistrate judge's order allowing plaintiff leave to file belated response); *Spears v. City of Indianapolis,* 74 F.3d 153, 157 (7th Cir.1996) (judge has a right to expect that deadlines will be honored). When reviewing challenges for abuse of discretion in district court scheduling, matters of trial management are for the district judge and we intervene only when it is apparent the judge has acted unreasonably. *Brooks v. United States,* 64 F.3d 251, 256–57 (7th Cir.1995); *see also United States v. Hamm,* 786 F.2d 804, 806–07 (7th Cir.1986) ("A trial court has discretion when considering an untimely motion and a reviewing court may disturb the trial court's decision only for clear error.").

Gonzalez's counsel's stock excuse, for repeated failures to meet court deadlines, was his busy trial schedule and Ingersoll's counsel's, extending professional courtesy, acquiescence. However, as we stated earlier in *Spears,* "a good judge sets deadlines, and the judge has a right to assume that deadlines will be honored." 74 F.3d at 157. The district court provided the parties with adequate notice and set reasonable deadlines for the filing of responsive motions. On three occasions, Gonzalez failed to either respond or seek an extension of time to file before the

4. Local Rule 12(n) of the General Rules of the United States District Court for the Northern District of Illinois requires the non-moving party to file a statement responding to each statement made by the moving party, noting any disagreement and referring to the record in support of any disagreement, and must also supply any additional facts that require denial of summary judgment. *Dade v. Sherwin–Williams Co.,* 128 F.3d 1135, 1139–40 (7th Cir.1997). Material facts set out by the moving party are deemed to be admitted unless controverted by the statement of the opposing party, and we require strict compliance with Local Rule 12. *Id.*

5. Gonzalez's response included a memorandum in opposition to summary judgment, her Rule 12(n) statement of uncontested facts and an attached affidavit.

court's deadline had passed. But now she asks this court to find that the district court abused its discretion by not allowing her to file her late response. Under these circumstances, there was no abuse of discretion. Far from it; the district court had granted several extensions, even though nothing at all had been filed during the period prescribed for responding to Ingersoll's summary judgment motions, and even though the grounds for extension provided by Gonzalez's lawyer seemed more like routine problems of office management than something that could not have been anticipated. The judge was therefore well within his discretion in concluding that Gonzalez had not demonstrated good cause for obtaining another extension of time. *See Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse–Wisconsin, Inc.,* 991 F.2d 1249, 1257 (7th Cir.1993) ("[A] decision to disregard all materials submitted after a reasonable filing deadline is certainly not an abuse of discretion because it allows the district court to preserve the moving party's right to respond to the resisting party's argument and to decide the summary judgment motion in a timely fashion.") (citation omitted). Thus, Gonzalez's untimely response brief, Local Rule 12(n) statement and attached affidavit, filed in response to Ingersoll's motion for summary judgment as to Count III, are not part of the record for purposes of this appeal and, to the extent they are supported by references to the record, we take as true the facts alleged in Ingersoll's Local Rule 12(m) statement. *See Dade v. Sherwin–Williams Co.,* 128 F.3d 1135, 1140 (7th Cir.1997) (district court did not err by refusing to consider additional facts when plaintiff failed to file Local Rule 12(n) statement of additional facts).

### B. Summary Judgment

■ Gonzalez challenges the grant of summary judgment for Ingersoll on all three counts. Our review is *de novo*: the record and all inferences drawn therefrom will be viewed in the light most favorable to Gonzalez. *See Erdman v. City of Ft. Atkinson,* 84 F.3d 960, 961 (7th Cir.1996). Summary judgment is proper only if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The non-movant party may not rely upon mere allegations, but must present specific facts to show that a genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552. Although courts weighing summary judgment motions in employment cases must take special care not to invade the province of the fact finder, employment cases are governed by the same rules that govern other summary judgment cases, and they are equally amenable to summary disposition so long as there is no genuine dispute as to material facts. *Giannopoulos v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 410 (7th Cir.1997).

### 1. Racial Discrimination Claim

In Count I of Gonzalez's Amended Complaint, Gonzalez contends that in December 1993 she was subject to disparate treatment in Ingersoll's layoff policy because other similarly situated white employees were not subjected to layoff. She further contends that Ingersoll's articulated reason for the layoff, downsizing, was merely a pretextual disguise for racial discrimination.

■ Title VII makes it unlawful for an employer to discriminate against an employee because of the employee's race or national origin. 42 U.S.C. § 2000e–2(a)(1). Proof of intentional discrimination is required under a disparate treatment analysis. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). A Title VII plaintiff can satisfy her burden of proof by two avenues: (1) she may present direct evidence of discriminatory intent or, because of the difficulty in directly proving discrimination, (2) she may use the indirect, burden-shifting procedure set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Pasqua v.*

*Metropolitan Life Ins. Co.,* 101 F.3d 514, 516 (7th Cir.1996). Gonzalez relies upon the *McDonnell Douglas* avenue.

 Under the *McDonnell Douglas* burden-shifting approach, Gonzalez must initially establish a prima facie case of racial and/or ethnic discrimination by a preponderance of the evidence. *Pasqua,* 101 F.3d at 516. To establish a prima facie case of racial discrimination requires Gonzalez to show she was (1) in a protected class; (2) performing her job satisfactorily; (3) the subject of a materially adverse employment action; and (4) others outside of the protected class were treated more favorably. *Young v. Will County Dept. of Public Aid,* 882 F.2d 290, 293 (7th Cir.1989). Once Gonzalez establishes a prima facie case, the burden shifts to Ingersoll to "articulate some legitimate, nondiscriminatory reason" for its action. *Flowers v. Crouch–Walker Corp.,* 552 F.2d 1277, 1281 (7th Cir.1977), *citing McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. If Ingersoll meets its burden of establishing a legitimate, nondiscriminatory reason for the layoff, Gonzalez then has an opportunity to show that the articulated reason was in fact pretext. *See McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. The ultimate burden of proof remains with Gonzalez at all times. *See, e.g., Kirk v. Federal Property Management Corp.,* 22 F.3d 135, 138 (7th Cir.1994).

Ingersoll claims it is entitled to summary judgment on Gonzalez's Title VII claim because Gonzalez failed to provide any evidence that others outside the protected class were treated more favorably than Gonzalez. The district court agreed, finding that Gonzalez failed to establish a prima facie case of discrimination because she could not point to a similarly situated employee outside the protected class who had received more favorable treatment. Despite finding the allegations were not part of Gonzalez's EEOC complaint, the district court also found that Gonzalez failed to establish that Ingersoll's layoff and recall policies were pretextual.

Gonzalez's Title VII arguments on appeal are convoluted. In her brief, she states that she has "relied upon the indirect method of proof rather than the direct method" and

that she has met the *McDonnell Douglas* four-step analysis. However, Gonzalez's brief also appears to assert that evidence of disparate salaries and wages between blacks and whites provide direct evidence of Ingersoll's discrimination. With respect to this argument, Gonzalez asserts that the district court ignored direct evidence of intentional race discrimination found in certain interrogatory answers regarding employee salaries provided by Ingersoll.

 The district court found that Gonzalez's allegations of disparate salary treatment and discriminatory recall were not properly before the court because Gonzalez failed to raise these issues in either her charge of discrimination to the EEOC or her complaint and because the salary information is not related in any way to her layoff or recall. Furthermore, the district court found that even if these issues were properly raised, Gonzalez failed to provide any evidence that Ingersoll's nondiscriminatory reasons were a pretext for discrimination. We agree with the district court for two reasons. First, Gonzalez never raised these issues, disparate salaries and discriminatory recall, until the eleventh hour in an attempt to avoid summary judgment. *See Oates v. Discovery Zone,* 116 F.3d 1161, 1168 (7th Cir.1997) (allegations that are not contained in an EEOC charge cannot be contained in a subsequent complaint filed in the district court) (internal citations omitted); *Kirk,* 22 F.3d at 139 (Title VII plaintiff cannot bring a claim of discrimination in educational opportunities where only EEOC charge was failure to promote); *Taylor v. Western and Southern Life Ins. Co.,* 966 F.2d 1188, 1194 (7th Cir.1992) (Title VII plaintiffs cannot bring claims in a lawsuit that were not included in their EEOC charge). Second, even if we were to find that the salary and recall discrimination were related to her alleged discriminatory layoff claim, Gonzalez provided the court with neither specific support for her allegations of disparate salary treatment nor evidence that Ingersoll's inability to contact her about the recall was a pretext to discriminate. Rather, she makes the conclusory assertion that the evidence shows racial bias towards blacks without pointing to any specific instance or

providing any kind of comparative analysis in support. In fact, as Ingersoll points out, in December 1993, the time of the disputed layoff, Gonzalez and David Thompson were Ingersoll's only F–12 electrical assemblers. On January 1, 1992, Gonzalez was actually earning $1,500 more per year than was a similarly situated white male, Thompson ($18,000 versus $16,500).

Although Gonzalez claims there were other, less senior employees in the F–12 classification who were not laid off when she was, Gonzalez fails to set forth any evidence to support this contention. The only other F–12 electrical assembler in her unit was laid off when she was. Also, the other employees cited by Gonzalez who had not been laid off, and who had less seniority then Gonzalez, all had higher work classifications than Gonzalez and, thus, were not similarly situated. Furthermore, Gonzalez never raised, until summary judgment, her argument that Ingersoll's RIF policy itself was discriminatory and, when she did raise this issue, never presented any evidence in support. Thus, the district court properly dismissed Gonzalez's Title VII claim.

### 2. § 1981 Claim

In Count II of Gonzalez's Amended Complaint, Gonzalez claims that she had an employment contract with Ingersoll and was discriminated against with regard to a "term or condition" of that contract in violation of 42 U.S.C. § 1981. In particular, Gonzalez contends that she suffered discrimination with respect to Ingersoll's layoff and termination policy because she was laid off and other similarly situated white employees were not. However, Gonzalez never challenged Ingersoll's RIF, layoff and/or termination policies as discriminatory in and of themselves below and, thus, is barred from raising them for the first time now. *See Oates v. Discovery Zone*, 116 F.3d 1161, 1168 (7th Cir.1997) ("it is axiomatic that arguments not raised below are waived on appeal") (internal citation omitted).

The district court dismissed Gonzalez's section 1981 claim for two reasons: (1) there was never a contract between Gonzalez and Ingersoll to give rise to a section 1981 claim

in the first place; and (2) even if there was a contract, postformation discriminatory treatment of an employee is not covered by section 1981. Ingersoll adds another basis for dismissal, arguing that even if there was a contractual relationship Gonzalez failed to provide sufficient evidence to show that she was discriminated against under the *McDonnell Douglas* burden shifting method. Gonzalez, on the other hand, argues that summary judgment was improper because the district court failed to evaluate the section 1981 claim under the same analytical model as Title VII claims and because the district court improperly limited the scope of section 1981 as amended by the Civil Rights Act of 1991 (the "Act"). We agree that the district court improperly limited the scope of section 1981, but affirm the district court's grant of summary judgment because there was no contractual relationship and even if there was Gonzalez failed to meet her burden under *McDonnell Douglas*.

The legislative history of the Civil Rights Act of 1991 indicates that it was enacted in response to a number of decisions by the United States Supreme Court that were perceived to sharply cut back on the scope and effectiveness of federal civil rights laws. See H.R.Rep. No. 102–40(I), at 18, *reprinted* in 1991 U.S.C.C.A.N. 549, 556. Important to this suit, the Act overrules the Supreme Court's 1989 decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). *See id.* at 89, *reprinted in* 1991 U.S.C.C.A.N. 549, 627. In *Patterson*, the Court held that section 1981's guarantee that all persons have "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens" does not prohibit racial harassment on the job and other forms of race discrimination occurring after the formation of a contract. 491 U.S. at 171, 109 S.Ct. at 2372. Section 12 of the Act amends section 1981 to reaffirm that the right "to make and enforce contracts" includes the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship. *See* H.R. Rep. 102–40(II), at 37, *reprinted in* 1991 U.S.C.C.A.N. 549, 730–31. Specifically, Section 12 of the Act adds Subsection (b) to section 1981 which states:

**1034**

**(b) "Make and enforce contracts" defined**

For the purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

This subsection was added to section 1981 specifically to overrule *Patterson*. H.R. Rep. 102–40(II), at 37, *reprinted in* 1991 U.S.C.C.A.N. 549, 730–31. Furthermore, this subsection makes it clear that the right to "make and enforce contracts" free from race discrimination includes "the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." *See id.* The House Committee report indicates that this list is intended to be illustrative and not exhaustive. *Id.* "In the context of employment discrimination, for example, this would include, but is not limited to, claims of harassment, discharge, demotion, promotion, transfer, retaliation, and hiring." *Id.*

▪ The district court erred, as a matter of law, when it stated that "Section 1981 does not apply ... to conduct which occurs after the formation of the contract." Furthermore, the district court's reliance on *Sofferin v. American Airlines, Inc.*, 923 F.2d 552 (7th Cir.1991) (finding discriminatory post-formation conduct, including discharge, not protected under section 1981), is misplaced because that case relied on *Patterson*. Claims with respect to discriminatory layoffs and recalls are clearly protected under section 1981, as amended by the Civil Rights Act of 1991, because they relate to either the performance or modification of a contract of employment.

However, we agree with the district court that, to the extent that Gonzalez is claiming that Ingersoll interfered with her right to enter into an employment contract by not recalling her from the layoff, there was no employment contract to interfere with. Gonzalez failed to establish the existence of a contractual relationship with her employer sufficient to support a section 1981 claim and failed to produce evidence of racial discrimination, and thus, her section 1981 claim could not be sustained.

Section 1981 provides:

**(a) Statement of equal rights**

All persons ... shall have the same right ... to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....

By its terms, section 1981 governs contractual relationships. Gonzalez's section 1981 claim lacks merit because there is no evidence to show that she had ever been employed under a contract with Ingersoll or that she was after her return in October, 1994. Section 1981 bars all racial discrimination with respect to making and enforcing contracts. 42 U.S.C. § 1981(a). In order to bring a section 1981 claim there must at least be a contract. In her response to Ingersoll's interrogatories, Gonzalez claimed that an employment contract existed between her and Ingersoll based on Ingersoll's employee handbook. However, as the district court stated, the employee handbook did not constitute an employment contract. Gonzalez does not challenge this finding on appeal, rather Gonzalez argues that she had an "employment at will" contract.

▪ Under Illinois law, an employer-employee relationship without an explicit durational term is presumed to be an at-will relationship. *See Evans v. Gurnee Inns, Inc.*, 268 Ill.App.3d 1098, 206 Ill.Dec. 551, 554, 645 N.E.2d 556, 559 (1 Dist.1994). Illinois employment-at-will doctrine allows an employer to discharge an employee at-will for any reason or for no reasons, except when the discharge violates clearly mandated public policy. *Talley v. Washington Inventory Service*, 37 F.3d 310, 311 (7th Cir.1994). Since *McKnight v. General Motors Corp.*, 908 F.2d 104 (7th Cir.1990) ("A contract for employment at will may end abruptly but it is a real and continuing contract nonetheless, not a series of contracts each a day—or a minute—long."), we have not addressed the issue of whether employment at-will provides a sufficient contractual relationship to support section 1981 claims.

Although dicta in *McKnight* suggests that an employment at-will situation might support section 1981 claims, its validity today is questionable given that case's reliance on *Patterson.* Furthermore, the extent of the employment at-will contractual relationship, discussed by Chief Judge Posner in *McKnight*, covered "wages, benefits, duties, working conditions" and all other terms but one, the term of the employment. *Id.* at 109. Arguably, since Gonzalez was an employee at-will, and did not have any contractual rights regarding the term of her employment, she cannot claim that she was discriminated against with respect to Ingersoll's lay-off. Other courts that have dealt with this issue post-*Patterson* have dismissed section 1981 claims brought by at-will employees, finding no underlying contractual relationship. See *Moorer v. Grumman Aerospace Corp.*, 964 F.Supp. 665 (E.D.N.Y.1997) (At-will employee's section 1981 claim for layoff due to company reduction in force dismissed); *Moscowitz v. Brown*, 850 F.Supp. 1185 (S.D.N.Y.1994) (At-will employee's section 1981 action arising out of his termination from positions with both police department and board of education dismissed); and *Askew v. May Merchandising Corp.*, No. 87–CIV–7835, 1991 WL 24390 (S.D.N.Y. Feb. 20, 1991) (The absence of a contractual relationship is fatal to at-will employee's section 1981 claim).

However, we need not determine whether Gonzalez's at-will status provided adequate support for her section 1981 claim because even if we were to allow Gonzalez's section 1981 claim to stand, based on finding Gonzalez had a contractual relationship with Ingersoll, it would fail for the same reasons as her Title VII claim. The same standards governing liability under Title VII apply to section 1981. *Rush v. McDonald's Corporation*, 966 F.2d 1104, 1113 n. 34 (7th Cir.1992); *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 511 (7th Cir.1986). As in her Title VII claim, Gonzalez provided no direct evidence of discrimination and could not point to a similarly situated employee in an unprotected class who was more favorably treated.

Moreover, even if we were to find that she did establish a prima facie case, Gonzalez failed to provide any evidence contradicting Ingersoll's nondiscriminatory reasons for her lay-off and subsequent recall.

### 3. Retaliation Claim

In Count III of Gonzalez's Amended Complaint, Gonzalez claims that Ingersoll retaliated against her for bringing her discrimination charge with the EEOC, and subsequent lawsuit, in violation of 42 U.S.C. § 2000e–3. According to Gonzalez, Ingersoll's retaliation was demonstrated by two actions: (1) her transfer from the Pike Road facility to the Eddy Avenue facility; and (2) her demotion from the box assembly division to the custodial department. Ingersoll, on the other hand, contends that it provided nondiscriminatory reasons for both of Gonzalez's purported adverse employment actions which Gonzalez failed to rebut with credible evidence. On appeal, Gonzalez does not challenge the district court's finding that the facility transfer was not an "adverse employment action." Thus, we review Gonzalez's retaliation claim only as to her demotion.

Title VII makes it unlawful for an employer to discriminate against an employee because the employee brings a charge of discriminatory conduct made unlawful under Title VII. 42 U.S.C. § 2000e–3(a); *Pasqua*, 101 F.3d at 517. To establish a prima facie case of retaliation under the *McDonnell Douglas* framework, Gonzalez must establish by a preponderance of the evidence that: (1) she participated in protected activity or opposed an activity made unlawful under Title VII; (2) she subsequently suffered adverse employment action; and (3) there was a causal connection between the adverse employment action and her participation or opposition. *Pasqua*, 101 F.3d at 518, *citing Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705, 708 (7th Cir.1995). The parties agree that Gonzalez met the first two requirements.[6] However, they dispute whether the third requirement, a causal connection be-

6. Although Ingersoll agrees, for purposes of summary judgment, that Gonzalez met the first two elements of a prima facie case of retaliation, it disagrees with Gonzalez that transfer to the Eddy facility constituted an "adverse employment action."

tween her demotion and her complaint, was satisfied.

On appeal, Gonzalez points solely to five paragraphs in her Local 12(n) statement, filed as part of her response to Ingersoll's motion for summary judgment as to Count III, for support. However, as discussed earlier, the district court refused to accept Gonzalez's Local Rule 12(n) statement. Thus, it is not part of the record for purposes of this appeal. Gonzalez points to no other evidence in support of her retaliation claim.

 It is clear from the record that Gonzalez was demoted because of her exceptionally poor performance and chronic absenteeism. Gonzalez produced no evidence to suggest that Ingersoll's employees who complained about Gonzalez's performance were lying or had improper motives. In fact, the evidence shows that Ingersoll was more than lenient in addressing Gonzalez's deficiencies in attitude, attendance and performance. Gonzalez was informed on several occasions of her performance deficiencies. Gonzalez's error rate on her box assemblies was about fifty percent, higher than any other Ingersoll employee. She was given several warnings about her poor performance. After meeting with Ingersoll's CEO, Fred Wilson, Gonzalez was given an additional sixty day probationary period in which to show improvement in both her performance and absenteeism. Unfortunately, Gonzalez showed no improvement. Gonzalez presented no evidence that Ingersoll's supervisor and manager complaints, regarding Gonzalez's absenteeism and performance, were connected to her Title VII discrimination claims. On this record, a rational jury could not conclude that Ingersoll gave low productivity and disciplinary actions as pretextual reasons for demoting Gonzalez on account of her race or ethnic origin, or because she exercised her rights under Title VII. As we have stated in the past: "Title VII ... is not an insurance policy against unemployment for poor or insubordinate job performance." *Kirk v. Federal Property Management Corp.*, 22 F.3d 135, 136 (7th Cir.1994). The district court properly dismissed Gonzalez's retaliation claim.

## III. CONCLUSION

The district court did not abuse its discretion by denying Gonzalez's untimely motion to accept her late response. Gonzalez failed to establish a prima facie case of discrimination. Even if Gonzalez had established a prima facie case, she failed to come forward with any evidence to rebut the legitimate, nondiscriminatory reasons given by Ingersoll for its layoff and, subsequent, recall. Thus, Gonzalez failed to raise a genuine issue of material fact that might allow a jury to find for Gonzalez on any of her discrimination claims. Moreover, Gonzalez failed to establish a prima facie case of retaliation. For the foregoing reasons, we AFFIRM the district court's entry of summary judgment in favor of Ingersoll on all counts.